[Crim. No. 314.   Third Appellate District.—August 16, 1915.]

## THE PEOPLE, Respondent, v. JAMES WHITE, Appellant.

CRIMINAL LAW—GRAND LARCENY—CORPUS DELICTI—SUFFICIENCY OF EVIDENCE.—In this prosecution for grand larceny it is held that the evidence was sufficient to establish the *corpus delicti,* independent of the confession of the defendant; and that evidence of the people, in itself and without the aid of the testimony of the accomplice, tended to connect the defendant with the commission of the offense.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order denying a new trial. J. A. Plummer, Judge.

The facts are stated in the opinion of the court.

A. H. Carpenter, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—This is an appeal by the defendant from a judgment of conviction of the crime of grand larceny and from an order denying his motion for a new trial.

The information by which the defendant was accused and upon which he was convicted of said crime alleges that, on or about the fifteenth day of June, 1914, in the county of San Joaquin, he feloniously stole and drove away five head of cattle, which were then the personal property of one Isaac Kirk.

The sole proposition upon which the defendant bases his claim for a reversal is that the people failed to show that a crime had been committed, or, in other words, failed to establish the *corpus delicti*. This contention cannot be maintained, as a brief examination of the evidence will verify.

One Mosely testified that the defendant called on him some few days prior to the date of the commission of the crime charged in the information and proposed that he (Mosely) join him (the defendant) in taking from the farm of Isaac Kirk a number of cattle, selling the same and dividing in equal proportions between themselves the proceeds of such sale. The witness readily acquiesced in the proposition and, accordingly, during the night of the fifteenth day of June, 1914, the two went to the farm of Kirk and drove away five head of cattle, some of which bore the brand and ear-mark of said Kirk. The cattle were driven by the men to a point several miles distant from Kirk's place and were placed in a pasture. A few days thereafter the defendant sold the cattle to one Patrick Lynch, a farmer living a short distance from where the cattle had been put to pasture by Mosely and White. The defendant received the money on said sale and gave Mosely approximately an equal share of the same.

A number of witnesses testified to the fact of having seen White and Mosely on the night mentioned driving the cattle from the direction of Kirk's farm.

Shortly after the cattle were taken Kirk called at the district attorney's office, and to that official stated that the cattle had been stolen and driven from his place. At this time Kirk, who is a man of advanced years, did not know who had stolen the stock and had no suspicion against any particular person in connection with the larceny. It appears, however, that the sheriff and district attorney, having previously been apprised of the larceny, started and prosecuted an investigation, with

the result that they obtained evidence conclusively showing that White and Mosely had taken the cattle and sold them to Lynch. This information was given by the officers to Kirk.

It appears that White and his wife were and had been for many years intimate friends of Kirk. In fact, the testimony shows that Kirk had known Mrs. White from the time of her babyhood; that he had been a personal friend of her parents and that when she was christened he was nominated as her god-father; that both she and her husband (the defendant) had long been employed on the farm of Kirk and that the defendant had as such employee taken care of the stock and performed other duties connected with the ranch. In brief, Kirk was very fond of both White and his wife and had unrestricted confidence in their honesty and integrity. When, therefore, the district attorney informed Kirk that he had gathered evidence showing beyond any doubt that White had stolen the cattle, he was greatly shocked and affected and seemed to be much concerned about the consequences of the defendant's conviction of the crime to White's children, of whom it was shown he was also very fond. He declared to the district attorney, however, that he would swear to a complaint charging White with the commission of the larceny, and made good the intention so expressed by accompanying the district attorney to the office of a justice of the peace in the city of Stockton, before whom he lodged a complaint against White.

At the trial of the case, however, Kirk having evidently relented in his feeling toward White's conduct and so receded from his original determination to prosecute the defendant, testified favorably to the accused. He said that both White and his wife pastured cattle of their own on his ranch and by his permission had branded said cattle with his (Kirk's) brand; that he had seen the cattle sold to Lynch by White on his ranch, but that he was unable to say whether they were his cattle or those of White and his wife. He further testified that White had authority from him to sell his cattle whenever he (White) thought it necessary or a wise business proposition to do so, and that White often made such sales without consulting him and that he (White) always accounted to him (Kirk) for the proceeds of such sales, although he admitted that White had not turned over to him the money he received for the cattle sold to Lynch.

The foregoing is, substantially, the testimony of Kirk, and upon it and the claim that there is no other testimony tending to disclose that a crime was committed than that of an accomplice the defendant predicates the contention that the *corpus delicti* was not proved.

But there is in this case other testimony disclosing facts and circumstances from which the jury were warranted in finding that the cattle referred to in the information were the property of Kirk, that they were feloniously taken from his ranch, and, consequently, the crime charged had been committed.

There is no denial of the fact that the defendant and Mosely went to Kirk's ranch in the night-time and drove the cattle therefrom to a point several miles away during hours of the day when it was more than probable that they would not be seen by persons who knew them or had any acquaintance with the fact of the ownership of the stock. It is not disputed that White sold the cattle to one Lynch and received pay therefor, and Kirk himself testified that he had never received any part of the proceeds of said sale. The fact that Kirk was willing to and did in fact swear to a complaint charging White with the commission of the crime constitutes a strong circumstance from which the jury had the right to infer that the cattle were the property of Kirk and that they were without his authority taken from his pasture and sold. All these circumstances constituted strong incriminatory proof against White and corroborated Mosely in the declaration that he and White went to the ranch of Kirk on the night in question for the purpose of stealing the stock. Moreover, the defendant confessed to the officers that he stole the cattle.

As to the testimony of Kirk, of which we have hitherto reproduced herein a substantially correct statement, it is manifest that the jury reached the conclusion (and very justly so, apparently), that its reliability was greatly shaken, if not altogether destroyed, by testimony introduced by the people in impeachment thereof. The impeaching testimony thus mentioned tended to prove the following facts: That, a few days after the commission of the alleged larceny, Kirk, accompanied by three neighbors and personal acquaintances, visited the Lynch Ranch and inspected the cattle sold by White to Lynch; that, on that occasion, he identified said cattle as his property; that, subsequently, at the office of the

district attorney, he unqualifiedly declared, in the presence of that officer and several other persons there present, including a stenographic reporter, who reduced his statement to writing, that the cattle sold to Lynch by White were his property and that they were taken from his place and sold without his knowledge or consent. We have the right to assume, in support of the verdict, that the jury believed the evidence presented in impeachment of Kirk's testimony, and so repudiated and wholly disregarded it in reaching a conclusion upon the question of the defendant's guilt or innocence. Indeed, it is very obvious that the jury could not have consistently accorded any weight or credence to Kirk's testimony if they believed the testimony showing that he had made declarations directly in conflict with those to which he swore at the trial, and, on the other hand, if they had believed his testimony in its entirety, it is manifest that no other course would have been open to them but to acquit the accused and would in that case undoubtedly have done so. As suggested, we may assume from their verdict that they did not believe his story.

We think that there can be no doubt that the *corpus delicti* was clearly enough established by testimony other than that of the confession of the defendant, and, furthermore, that the people presented evidence, independent of the testimony of the accomplice, Mosely, "which in itself and without the aid of the testimony of" said accomplice, tended "to connect the defendant with the commission of the offense." (Pen. Code, sec. 1111.)

The judgment and the order are affirmed.

Chipman, P. J., and Ellison, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 11, 1915.